**STATE of Missouri, Respondent,**

v.

**Willie SIMMONS, Appellant.**

No. 77439.

Supreme Court of Missouri,
En Banc.

Sept. 30, 1997.

As Modified on Denial of Rehearing
Nov. 25, 1997.

Janet M. Thompson, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for Respondent.

LIMBAUGH, Judge.

A jury convicted Willie Simmons of the first degree murder of Leonora McClendon and sentenced him to death. The postconviction court overruled Simmons' Rule 29.15 motion after an evidentiary hearing. This Court has jurisdiction of the appeals. Mo. Const. art. V, sec. 3. We affirm the judgments.

## I. FACTS

Simmons was charged with the murder of Leonora McClendon in the second count of a two-count indictment. The first count charged Simmons with the murder of Cheri Johnson. Simmons was originally tried for both counts in the same proceeding and was found guilty on both counts. This Court overturned those convictions on the basis that the two murder charges should not have been tried together. *State v. Simmons*, 815 S.W.2d 426 (Mo. banc 1991). On remand, Simmons was first tried for the murder of Cheri Johnson and once again found guilty. He was then tried and convicted in the case at hand for the murder of McClendon.

The evidence at trial, which we review in the light most favorable to the verdict, *State v. Storey*, 901 S.W.2d 886, 891 (Mo. banc 1995), reveals the following:

McClendon's murdered body was discovered in her apartment in St. Louis on October 27, 1987, after neighbors complained of foul odors. She was found lying in her bathtub in an advanced state of decomposition with her ankles and hands bound. A cloth gag had been forced down her throat and was held in place by a cloth tied over her mouth. The medical examiner determined that McClendon died from asphyxiation.

In an initial search of McClendon's apartment, the police found a piece of paper with the initials "JR," which is Simmons' nickname, and Simmons' telephone number written on it. This led the police to interview Simmons on October 29, 1987. In this initial interview, Simmons told the police that he had met McClendon in the last week of August 1987, that they dated one time, that he had not seen her since the one date, and that he had never been to her apartment. On January 3, 1988, Simmons was interviewed by the police in relation to the Cheri Johnson murder and was taken into custody. While performing an inventory search of Simmons' wallet, the police discovered three pawn tickets, one for Fay's Furniture Store that was made out in McClendon's name and was dated July 23, 1987,[1] and claim checks for a CPI photography lab. Upon presenting the pawn ticket to Fay's Furniture Store, police were told that the ticket was for a watch that had been pawned on July 23, 1987, and that the name on the ticket, Leonora McClendon, designated who had pawned the watch. The police used the claim checks to obtain the photographs from the CPI lab.

In a third interview on January 4, 1988, Simmons told the police that he and McClendon had dated three or four times and that he had been to her apartment three or four times. Simmons was confronted with the prior inconsistent statement he had made to police officers on October 29, and at that point the interview was terminated. Also on January 4, Sharon Wright contacted the police with information about the crime. She told the police that on the night McClendon's body was found Simmons was at her apartment watching television. When they heard a news report about a female body being found in the Lindell Apartments, Simmons said "that he knew the lady, her name was Leonora McClendon, and ... that he believed that her boyfriend killed her." At that point in the news report, the name of the victim had not been released. Wright also turned over several items that Simmons had left in her apartment when he had temporarily stayed with her soon after the murder. These items included ceramic masks, a watch and a jewelry box and were all identified as belonging to McClendon.

1. The other two pawn tickets were relevant to Simmons' trial for the murder of Cheri Johnson.

During the penalty phase the only witness presented by Simmons was his mother, who testified that she and his family have maintained contact with Simmons and would continue to do so if he were sentenced to life without parole. The State presented four statutory aggravating circumstances and several nonstatutory aggravating circumstances, which were all found by the jury.

## II. ALLEGATIONS OF TRIAL COURT ERRORS

### A. MOTION TO DISMISS INDICTMENT

█ Simmons claims that the trial court erred in overruling his motion to dismiss the indictment because his trial for the murder of McClendon violated double jeopardy and collateral estoppel principles. This claim arises from fact that, during Simmons' previous trial for the murder of Cheri Johnson, one of the aggravating circumstances submitted to the jury was the alleged murder of Leonora McClendon. The Johnson jury did not list this aggravator on the verdict form as one of the aggravators it found beyond a reasonable doubt. In pressing his claim of trial court error to this Court, Simmons advances the theory that the jury's treatment of the McClendon aggravator during the Johnson trial was the equivalent of a judgment of acquittal for the murder of McClendon.

Simmons argues that the Supreme Court's holding in *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), clearly supports his double jeopardy argument. *Bullington*, however, does not help him. Bullington had received life imprisonment after the penalty phase of his initial first degree murder trial, a penalty phase that mirrored the "trial" aspects of a guilt phase. Upon retrial after reversal of his conviction, he received a death sentence. The Court reasoned that a death penalty phase that resembles a trial is a proceeding to which jeopardy attaches, and that a sentence of life imprisonment at a first trial is tantamount to an "acquittal" of the death penalty. *Id.* at 446, 101 S.Ct. at 1862. Therefore, it held that once a person has gone through this type of penalty phase pro-

ceeding and received life imprisonment, that person cannot constitutionally be subjected to a possible death sentence for the same crime. *Id.*

█ The result in the first penalty phase of our case was directly opposite to that in *Bullington*—Simmons received the death penalty at the first trial and, therefore, never received an "acquittal" to which *Bullington* protection applies. Much more pertinent to Simmons' case is *Poland v. Arizona*, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986), in which the Supreme Court held that the failure to find a particular aggravating circumstance during a sentencing proceeding does not serve as an acquittal of that circumstance. *Id.* at 155, 106 S.Ct. at 1755. In explanation, the Court stated:

> We reject the fundamental premise of petitioners' argument, namely, that a capital sentencer's failure to find a particular aggravating circumstance alleged by the prosecution always constitutes an "acquittal" of that circumstance for double jeopardy purposes. *Bullington* indicates that the proper inquiry is whether the sentencer or reviewing court has "decided that the prosecution has not proved its case" *that the death penalty is appropriate.* We are not prepared to extend *Bullington* further and view the capital sentencing hearing as a set of minitrials on the existence of each aggravating circumstance. Such an approach would push the analogy on which *Bullington* is based past the breaking point.
>
> Aggravating circumstances are not separate penalties or offenses, but are "standards to guide the making of [the] choice" between the alternative verdicts of death and life imprisonment. Thus, under Arizona's capital sentencing scheme, the judge's finding of any particular aggravating circumstance does not of itself "convict" a defendant (i.e., require the death penalty), and the failure to find any particular aggravating circumstance does not "acquit" a defendant (i.e., preclude the death penalty).

*Id.* at 155–56, 106 S.Ct. at 1755. The principle that emerges from *Bullington* and *Po-*

*land* is that the failure to find a particular aggravating circumstance forms the basis for a judgment of acquittal on the imposition of the death sentence only when there is a complete failure to find that any aggravating circumstance exists to support the death sentence. In that context the offender receives a life sentence and is properly viewed as having received an acquittal of the death penalty. It simply does not follow, though, that the jury's failure in this case to find the McClendon murder as an aggravating circumstance operates as an acquittal of the death sentence. The jury's failure to make a finding on a particular aggravating circumstance is, in essence, no finding at all. Moreover, as *Poland* clearly teaches, aggravating circumstances like the McClendon murder are not separate penalties or offenses, on which the jury's finding produces a conviction or the jury's failure to find produces an acquittal. Therefore, double jeopardy protection does not attach.

■ Simmons' attempt to rely on collateral estoppel fares no better. In *Ashe v. Swenson*, the Supreme Court held that the federal rule of collateral estoppel is embodied in the Fifth Amendment guarantee against double jeopardy and applies to the states. 397 U.S. 436, 445, 90 S.Ct. 1189, 1195, 25 L.Ed.2d 469 (1970). The Court stated that the principle "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443, 90 S.Ct. at 1194. Subsequent Missouri case law utilizing *Ashe*, and a proper understanding of the principle of collateral estoppel, make clear that the principle does not bar Simmons' second trial for McClendon's murder.

■ As a general proposition, collateral estoppel bars relitigation of a specific fact or issue that was unambiguously determined by a previous jury. *State v. Nunley*, 923 S.W.2d 911, 922 (Mo. banc 1996). Its import in the criminal context, considering the "ultimate fact" language from *Ashe*, is that if a jury's decision can be distilled to a specific and

necessary finding of one particular fact, or finding on one specific issue, that fact or issue is barred from relitigation. *See State v. Johnson*, 598 S.W.2d 123, 125–26 (Mo. banc 1980); *State v. Booker*, 540 S.W.2d 90, 93 (Mo.App.1976) (noting that because it is usually impossible to discern a specific basis upon which a jury reaches its verdict, collateral estoppel will rarely be available in a criminal context); *see also State ex rel. Westfall v. Mason*, 594 S.W.2d 908, 913 (Mo. banc 1980) (holding that a jury's finding of no aggravators at a first trial does not preclude the State's seeking the death penalty at a second trial, because it is not clear why the jury decided the way it did at the first trial).[2]

The jury's failure in the Johnson murder case to find McClendon's murder as an aggravating circumstance is not a "finding" at all, but rather a lack of one; and the *Ashe* rationale does not even apply. A jury is not called on to make a specific finding one way or the other, such as guilty or not guilty, or "yes" the aggravator has been proved or "no" the aggravator has not been proved. Instead, a jury is instructed merely to list on the verdict form those aggravators that it has, in fact, found, and there is no specific requirement that a finding be made that the other proposed aggravators were not found. See MAI–CR3d 313.48B; MAI–CR3d 313.58B1.A. Moreover, the failure to make a finding does not necessarily mean that the aggravator was not proved. A jury is instructed three times to determine whether "one or more" aggravating circumstances exist before it can deliberate on the death penalty. MAI–CR3d 313.41B; MAI–CR3d 313.42B; MAI–CR3d 313.48B. Once a jury finds that one or more aggravators exist, as it did in the Johnson murder case, it is unnecessary for it to pass on the other proposed aggravators. A particular aggravator, for instance, may be avoided because it is more difficult to judge, even though with further review, a jury might well decide that adequate proof was made on that particular aggravator.

**2.** We note that *Mason* was decided before *Bullington* and would likely have come to a different result had we had *Bullington's* guidance on dou-

ble jeopardy principles. However, *Mason's* rationale is still compelling on the collateral estoppel issue.

For these reasons, we hold that the trial court did not err by denying Simmons' motion to dismiss the indictment and proceeding with trial.

## B. DISQUALIFICATION OF JUDGE

Simmons asserts that the trial court erred in overruling his motion to remand for a hearing on the State's motion to disqualify the judge originally assigned to Simmons' cases. The State's motion to disqualify was sustained on November 23, 1993, and the cases were transferred to a different judge. Simmons' motion for remand, filed January 6, 1994, alleged that the disqualification of the original judge was improper in that the State had already received an automatic change of judge under Rule 32.07 on January 6, 1992.

■ In ruling on the motion to remand for a hearing, the judge construed the State's motion against the original judge as a motion to disqualify for cause. There is nothing in the record to indicate that this interpretation was incorrect. Under Rule 32.10, the State could properly move for a disqualification for cause, even after previously receiving an automatic change of judge. Simmons does not contend that the original judge improperly assessed the impropriety of his continued involvement in the cases, and having apparently determined that he was biased, the judge properly removed himself from Simmons' cases. Under these facts, there was no reason to remand for a hearing on the State's motion for disqualification; thus, the trial court committed no error in overruling Simmons' motion to remand for a hearing.

## C. MOTION TO SUPPRESS

■ Simmons next argues that the trial court erred in denying his pretrial motion to suppress evidence obtained by the police through two of the pawn tickets and the CPI Photo receipts found in his wallet and in overruling his objection to the admission of this evidence at trial. We review the denial of a motion to suppress to determine whether sufficient evidence exists to support the trial court's decision. *State v. Wise*, 879 S.W.2d 494, 503 (Mo. banc 1994).

■ During the investigation, the police learned that the pawn ticket—which had McClendon's name on it—was for a watch pawned by McClendon in July 1987, and they used the photo receipts to recover photographs from the CPI lab. Simmons contends that the police violated his Fourth Amendment right to be free from unreasonable searches and seizures both when they seized the pawn ticket and photo receipts and later when they seized the watch and photographs. The seizure of the pawn ticket and photo receipts was part of a legitimate inventory search, despite Simmons' assertion that the police were merely rummaging through his wallet. To succeed on his challenge of the seizure of the watch and photographs, Simmons has the burden of showing standing through an expectation of privacy in the items seized. *Id.* at 504. Nevertheless, Simmons does not even attempt to identify any privacy interest in the evidence that was obtained from either the pawn tickets or the CPI receipts. Obviously, Simmons had no expectation of privacy in the premises of the photo development business; but more importantly, he relinquished any right of privacy he had in the photographs or negatives themselves by giving them to the developer. *See State v. Urban*, 798 S.W.2d 507, 514–15 (Mo.App.1990). In doing so, he assumed the risk that the photographs might be shown to others, even the authorities. *Id.* at 515. As to the pawn tickets, we are at a total loss to discern any expectation of privacy on the part of Simmons in stolen jewelry located in a public pawn shop. In sum, the trial court properly denied the motion to suppress and allowed admission of the evidence at trial.

## D. PROSECUTOR'S COMMENTS AT VOIR DIRE

■ Simmons makes numerous allegations of improper comments on the part of the prosecutor during voir dire. Only one of the comments he now complains of was objected to and, thus, properly preserved for appellate review. He contends that the trial court erred in overruling his objection to a statement by the prosecutor that "in regard to finding that [an aggravating circumstance is] not outweighed by a mitigating circum-

stance, that does not necessarily have to be a unanimous verdict." Simmons claims that this comment suggested to the venire panel that the jury's decision on the existence of mitigating circumstances had to be unanimous. The prosecutor's statement, however, suggests nothing of that sort. We find no merit to the claim, and the trial court properly overruled the objection.

We need not pass on the merits of the remainder of the allegedly improper comments. Having reviewed the entire record, we find that no manifest injustice or miscarriage of justice resulted from those comments even if they were improper and, therefore, we have no discretion to grant plain error relief. *See* Rule 30.20. We again find no merit to the claims.

### E. GUILT PHASE

1. Admission of Photographs and Ligatures

 Simmons makes various claims of error in regard to the admission of physical evidence. He first argues that the trial court erred in admitting autopsy photographs of McClendon's body because their prejudicial effect outweighed their probative value. The trial court has broad discretion in admitting allegedly gruesome photographs. *State v. Weems*, 840 S.W.2d 222, 229 (Mo. banc 1992). They may be admitted where they depict the nature and location of wounds, where they aid the jury in understanding testimony, where they aid in establishing any element of the State's case, or where they portray the condition or location of the victim's body. *Id.* The first photograph Simmons complains of depicted the body as it was received by the medical examiner, showed the position of the ligature that was over the outside of the victim's mouth, and showed what the victim was wearing at the time her body was found. The next two photographs depicted marks on the victim's body that were eliminated as possible causes of death. The last photograph was of the face of the victim and depicted the cloth gag that was found in her mouth. These photographs showed the condition of the victim's body and aided the jury in understanding the medical examiner's conclusion that the victim died from asphyxiation caused by the cloth gag found in her

mouth. The trial court did not abuse its discretion by admitting these photographs.

 Simmons next argues that the trial court committed plain error in admitting crime scene photographs, the ligatures found on the victim's body, and a photograph of an unidentified woman with Simmons' hands around her neck. These claims are subject to plain error review because their admission was either not objected to at trial or not included in the motion for new trial. The crime scene photographs admitted at trial depicted McClendon's body as she was found in her bathtub in her apartment with her hands and ankles bound. The types of wounds suffered and the appearance of the crime scene are relevant to deliberation, which is an element of first degree murder; thus, the crime scene photographs were admissible. *State v. Storey*, 901 S.W.2d 886, 895 (Mo. banc 1995). In this case, the ligatures with which McClendon had been bound and gagged were also properly admitted because they were highly relevant to the cause of death. *See State v. Isa*, 850 S.W.2d 876, 890 (Mo. banc 1993) (holding that demonstrative evidence is admissible when it is relevant to material facts at issue in the case). The trial court committed no error, plain or otherwise, in admitting the crime scene photographs or the ligatures.

 The photograph of Simmons in which he is playfully posed with his hands around the neck of an unidentified woman does not appear relevant to any issue in the guilt or penalty phase. Simmons argues that its admission was prejudicial because it invited the jury to speculate that he was the kind of person who strangled women. There is no evidence in the record, though, that the jury ever was made aware of the contents of this particular photo. The photo was part of a group of photos that was admitted as one exhibit. The record shows that the contents of this photo was not described to the jury during either guilt phase or penalty phase testimony and the exhibit which included this photo was never displayed to the jury. Simmons has failed to show how he was harmed by the admission of this photo because there is no indication that the jury was ever made

aware of its contents. We need not pass on the merits of this alleged error. Having reviewed the entire record, we find that no manifest injustice or miscarriage of justice resulted from the admission of this photograph even if the photograph was improperly admitted and, therefore, we have no discretion to grant plain error relief. *See* Rule 30.20.

In a directly related point, Simmons argues that the motion court clearly erred in denying his claims that trial counsel was ineffective for failing to adequately object to the admission of the crime scene photographs and the photograph of Simmons with his hands around the woman's neck. The admission of the crime scene photographs was proper; thus, counsel cannot be found ineffective for failing to make a non-meritorious objection. *State v. Kreutzer,* 928 S.W.2d 854, 869 (Mo. banc 1996). Since the record does not reflect that the jury saw the contents of the photograph of Simmons with his hands around the neck of the woman, he cannot have been prejudiced by counsel's failure to object; thus, counsel cannot be found ineffective. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The motion court's rejection of his claims was not clearly erroneous.

## 2. Testimony of Detective Blanks

■ Simmons argues that the trial court committed plain error by failing to declare a mistrial *sua sponte* after Detective Blanks testified for the State during the guilt phase. During his cross examination, Blanks testified that he interviewed Carla Naert, a resident in Lindell Towers at the time of the murder, shortly after the victim's body had been discovered. He testified that Naert reported to him that she had observed a person in or around the victim's apartment on October 20, 1987, and October 25, 1987. On redirect, Blanks stated that he felt that Naert's dates were in error. Simmons argues that this statement had the effect of telling the jury to disbelieve Naert's testimony. At this point in the trial, though, Naert had not testified. She was not called as a witness until the defense began its case.

Thus, Blanks' testimony could not have been a comment on Naert's testimony. Further, Blanks merely testified that he did not feel that her specific dates were accurate as to when she saw the person; he did not testify that he doubted the veracity of Naert's report that she saw the person during October 1987. The trial court had no reason to declare a mistrial. This point is denied.

## 3. Testimony of Ella Johnson and Sharon Wright

■ Simmons argues that the trial court plainly erred in allowing testimony from Ella Johnson and Sharon Wright that constituted evidence of prior bad acts. He points specifically to the guilt phase testimony of Johnson and Wright that Simmons temporarily stayed at their homes during part of the fall of 1987 and that they asked him to leave, and he also complains that Wright repeated this same testimony during the penalty phase. This testimony, Simmons contends, was evidence of prior bad acts because it allowed the jury to infer that Johnson and Wright asked him to leave their homes because he had mistreated them. Neither witness testified, though, to any unconnected crime or act committed by Simmons; thus, the testimony was not evidence of prior bad acts. *See Brown,* 902 S.W.2d 278, 287 (Mo. banc 1995). The testimony was simply part of a line of questioning in which the State elicited that Simmons had property with him during his stays with Johnson and Wright that was later identified as belonging to McClendon. The trial court committed no error, plain or otherwise, in allowing the testimony of Johnson and Wright.

## 4. Comments on Simmons' Failure to Appear

Simmons alleges that the trial court plainly erred in allowing testimony from Detective Maier and Detective Blanks that amounted to a comment on his constitutional right to remain silent. The testimony that Simmons complains of is Detective Maier's statement that Simmons did not appear for an interview in December 1987, after having promised to do so, and Detective Blanks' statement that the January 4, 1988, interview with Simmons

ended after he was confronted with the fact that his statements during this interview were inconsistent with ones he made during the October 29, 1987, interview.

We disagree that Detective Maier's testimony about Simmons' failure to appear for an interview was a comment on Simmons' right to remain silent. Regardless, Simmons was not in custody at that time, and evidence of a defendant's silence is only disallowed if the defendant was in custody. *State v. Kinder*, 942 S.W.2d 313, 326 (Mo. banc 1996). We also find that Detective Blanks' testimony was not a comment on Simmons' invocation of a right to remain silent. The detective did not testify that Simmons refused to answer any more questions or that he declined to say anything further. The detective simply stated that the interview was terminated, without specifying why or by whom it was terminated. The trial court committed no error in allowing the testimony of Detectives Maier and Blanks.

5. Instructional Error

Simmons claims that the trial court erred in approving the burden of proof instruction on the ground that the term "reasonable doubt" is improperly defined. This argument has been fully addressed in earlier cases and repeatedly rejected. *Kinder*, 942 S.W.2d at 330. This point is denied.

6. Closing Arguments

Simmons makes numerous allegations of error in regard to statements made by the prosecutor during the guilt phase arguments. Only two of Simmons' claims of error have been properly preserved for appellate review. The first is a statement by the prosecutor that "[t]he defense has no burden, and you can see from the witness that they presented that frankly speaking they didn't carry a burden of any kind of persuasion here." Simmons contends that even though the prosecutor prefaced his comment with the acknowledgment that Simmons had no burden of proof, the remainder of the comment impermissibly shifted the burden of proof. We disagree. The last portion of this comment merely suggested to

the jurors that the defense's trial strategy was consistent with the fact that Simmons carried no burden of proof. It did not shift the burden of proof. The trial court did not abuse its discretion by overruling the objection to this comment.

The other matter preserved for review was the trial court's overruling of an objection to the following statements:

The evidence all shows uncontroverted, uncontradicted and undenied that the only person she got it from, the only person who had access to it in this combination was Mr. Simmons, the killer. The only way this jewelry comes—comes from Miss McClendon is that she's murdered and left for dead so she can't identify the person.

Simmons argues that these remarks impermissibly commented on his failure to testify. To the contrary, they emphasized to the jury that the defense had not offered any explanation as to how Simmons had come into possession of the victim's jewelry. The State can properly refer to a defendant's failure to offer evidence, so long as there is no reference to the defendant's failure to testify. *State v. Phillips*, 940 S.W.2d 512, 519 (Mo. banc 1997). The trial court did not abuse its discretion in overruling the objection.

We need not pass on the merits of the remainder of the allegedly improper comments. Having reviewed the entire record, we find that no manifest injustice or miscarriage of justice resulted from those comments even if they were improper and, therefore, we have no discretion to grant plain error relief. *See* Rule 30.20. The claims are denied.

7. Sufficiency of the Evidence

Simmons claims that the State presented insufficient evidence to sustain his conviction for first degree murder. In reviewing the sufficiency of the evidence to support a criminal conviction, we view the evidence, together with all reasonable inferences drawn therefrom, in the light most favorable to the State and disregard all evidence and inferences to the contrary. *State v. Silvey*, 894 S.W.2d 662, 673 (Mo. banc 1995). Review is limited to a determination

of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *Id.*

■ The evidence showed that on the night McClendon's body was discovered Simmons heard a news report about the incident and stated that he knew that the woman who was killed was Leonora McClendon, even though no name was revealed in the report. In interviews with the police, Simmons gave inconsistent statements concerning the extent of his involvement with McClendon, initially claiming that he had dated her only once and later admitting that he had dated her and had been to her apartment three or four times beginning a couple of months before the October 1987 murder. The police also discovered that Simmons was in possession of several of McClendon's personal items soon after the date of the murder. This evidence was sufficient for a reasonable juror to determine that Simmons was guilty of killing McClendon.

■ Simmons also contends that the evidence was insufficient to prove deliberation. The victim, however, was bound at the hands and ankles, had a cloth shoved down her throat and held in place with another binding, and was left in this condition in a bathtub. These factual circumstances and the time necessary to accomplish them justify the inference that appellant deliberated in the murder. *State v. Fleer*, 851 S.W.2d 582, 600 (Mo.App.1993).

In conclusion, we hold that there was sufficient evidence for a reasonable juror to find Simmons guilty beyond a reasonable doubt of first degree murder.

### F. PENALTY PHASE

1. Opening Statement and Closing Argument

■ Only two of Simmons' claims of error in the penalty phase concerning the prosecutor's comments have been preserved for appellate review. The first is a statement by the prosecutor during the opening statement regarding the murder of Cheri Johnson. The prosecutor argued that Simmons de-manded Johnson's jewelry, and when she refused, he killed her. Simmons contends that the prosecutor was collaterally estopped from making this argument because the jury in the Johnson trial rejected the aggravator that Simmons killed Johnson for monetary gain. As stated earlier, though, the rejection of an aggravator is not a final judgment to which principles of collateral estoppel apply. *See supra*, Point II.A. Simmons also asserts that the prosecutor could not have reasonably believed that the evidence introduced in the penalty phase of this trial would support the financial motive for Johnson's killing. The prosecutor was not prohibited, though, from arguing this motive to the McClendon jury as long as he planned in good faith to introduce evidence to support this theory during the penalty phase. *See State v. Meanor*, 863 S.W.2d 884, 888 (Mo. banc 1993). In fact, the prosecutor stated that he did intend to introduce such evidence, via the logical inferences that can be drawn from Johnson's murder and the forcible removal of her jewelry. We conclude that the trial court did not err in allowing the argument as to a financial motive for Cheri Johnson's murder.

■ Simmons' second claim of error is the following argument by the prosecutor during closing arguments:

> What one of you would ever fault [McClendon's mother] for pulling that trigger and killing Mr. Simmons to save her daughter, to save other daughters of other people? What one of you would fault her for that? It is right and it would be just, justified in every respect that she make every effort to have saved her daughter, including killing the man who was killing her.

In *Storey*, 901 S.W.2d at 901–02, we held that a similar argument was improper, particularly because it was calculated to inflame the jury and referenced self-defense in the context of a specific crime. Based on our holding in *Storey*, we conclude that the above argument is also improper. However, the prejudice in *Storey* resulted from the cumulative effect of four serious errors. *See* 901 S.W.2d at 902–03. The isolated nature of the one improper argument in this case does not give rise to equivalent prejudice. We believe that the judge's failure to sustain Simmons'

objection to this argument was not sufficiently prejudicial to warrant reversal.

We need not pass on the merits of the remainder of the allegedly improper comments. After reviewing the entire record, we find that no manifest injustice or miscarriage of justice resulted from those comments even if they were improper and, therefore, we have no discretion to grant plain error relief. *See* Rule 30.20. The claims are denied.

### 2. Victim Impact Evidence

■■■■ Simmons argues that the trial court committed plain error by allowing victim impact evidence during both the guilt and penalty phases. The guilt phase evidence that Simmons complains of is the identification of the victim in several photos by her mother, Marva McClendon, and testimony from Marva McClendon that she had not ordered the victim's son a birthday cake for his October 20th birthday. These arguments are frivolous. We cannot perceive any way that Marva McClendon's identification of her daughter in two photographs constitutes victim impact evidence. Nor does the testimony concerning the ordering of the birthday cake fare any better. A full review of McClendon's testimony shows that the statement was made in the context of determining the timing of Leonora McClendon's death. Marva testified that Leonora had not called the week of her son's birthday and that she had not ordered a cake because she was waiting for Leonora to call.

■■■ Part of the penalty phase evidence that Simmons now contends was victim impact evidence was testimony from Ardella Johnson, Cheri Johnson's mother, and Isaiah Johnson, Cheri Johnson's father. Ardella testified that she had given her engagement ring to Cheri and Cheri would never have parted with it. Isaiah then identified several pieces of Cheri's jewelry in photographs of Cheri wearing the jewelry, including the engagement ring. Previous testimony had established that Simmons had pawned these items of jewelry after Cheri's death. The testimony of Ardella and Isaiah was not victim impact evidence but was properly presented at trial to support the State's theory that Simmons had killed Cheri Johnson, at least in part, for her jewelry.

■■■ The remaining penalty phase evidence of which Simmons complains is as follows:

> In penalty phase, [the prosecutor] recalled [Marva McClendon] to testify that Leonora, age 20 at her death, left two sons, now nine and twelve, whom Mrs. McClendon is raising. She described how she misses Leonora, who remembered all the holidays, and how sad family gatherings are now that their lives have been destroyed. Michellee Davis described her friendship with Leonora who gave Michellee the courage to do and try new things. Leonora's uncle and cousin described how they missed her and how it hurts that she is gone.

Simmons is correct in his assertion that this is victim impact evidence. He is not correct, however, in his assertion that it is improper. The United States and Missouri constitutions permit victim impact evidence at the penalty phase. *State v. Parker*, 886 S.W.2d 908, 926 (Mo. banc 1994). Indeed, the Supreme Court of the United States has held that evidence "about the victim and about the impact of the murder on the victim's family" is permissible. *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). In sum, Simmons' claims of improper victim impact evidence are without merit.

### 3. Aggravating Circumstances Instructions

Simmons claims that the trial court erred in submitting Instructions 20 and 21. Those instructions set forth the statutory and non-statutory aggravating circumstances, respectively, and read as follows:

#### INSTRUCTION NO. 20

In determining the punishment to be assessed against the defendant for the murder of Leanora [sic] McClendon, you must first unanimously determine whether one or more of the following aggravating circumstances exists:

1. Whether the defendant murdered Leanora McClendon, for the purpose of the defendant receiving money or anything

of monetary value from Leanora McClendon.

2. Whether the murder of Leanora McClendon involved depravity of mind and whether as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you unanimously find at least one of the following paragraphs and you must specify in you [sic] verdict which one of the following paragraphs you find, if any:

a. That the defendant inflicted physical pain or emotional suffering on Leanora McClendon and that the defendant did so for the purpose of making her suffer before dying;

b. That the defendant killed Leanora McClendon after she was bound or otherwise rendered helpless by the defendant and that defendant thereby exhibited a callous disregard for the sanctity of human life;

c. That the defendant committed repeated and excessive acts of physical abuse upon Leanora McClendon, and that the killing was therefore unreasonably brutal.

3. Whether Leanora McClendon was a potential witness in a pending investigation namely the assault upon her person and the theft of her jewelry between October 18, 1987 and October 27, 1987 and was killed as a result of her status as a potential witness.

4. Whether the murder of Leanora McClendon was committed while the defendant was engaged in the perpetration of robbery....

### INSTRUCTION NO. 21

If you have found beyond a reasonable doubt that one or more of the aggravating circumstances submitted in Instruction No. 20 exists, then, in determining the punishment to be assessed against the defendant for the murder of Leanora [sic] McClendon, you may also consider:

1. Whether the defendant pled guilty to Fraudulent Use of a Credit Device on May 21, 1984, in the Circuit Court of the City of St. Louis, State of Missouri.

2. Whether the defendant pled guilty to Passing a Bad Check: No Account on December 8, 1986, in the Circuit Court of the City of St. Louis, State of Missouri.

3. Whether the defendant pled guilty to Assault in the Third Degree of Stephen Davis on April 14, 1987, in the Circuit Court of the City of St. Louis, State of Missouri.

4. Whether the defendant pled guilty to Assault in the Third Degree of Jane Davis on April 14, 1987, in the Circuit Court of the City of St. Louis, State of Missouri.

5. Whether the defendant pled guilty to Trespass in the First Degree on April 14, 1987, in the Circuit Court of the City of St. Louis, State of Missouri.

6. Whether the defendant was found guilty of the Murder in the First Degree of Cheri Johnson on June 16, 1994, in the Circuit Court of the City of St. Louis, State of Missouri.

7. Whether the defendant stole the motor vehicle of Norma Whiteside as submitted in Instruction No. 22.

8. Whether the defendant assaulted Michelle Aldridge as submitted in Instruction No. 23.

9. Whether the defendant has a bent or trait of character exhibited by a history of physical abuse toward women....

Simmons contends that none of the aggravating circumstances contained in the above instructions should have been submitted to the jury. Three of the allegedly erroneous statutory aggravating circumstances have been preserved for appellate review: (1) depravity of mind; (2) potential witness in a pending investigation; and (3) murder committed in perpetration of robbery. Only one of the allegedly erroneous nonstatutory aggravating circumstances has been preserved for review: (1) finding of guilt for the murder of Cheri Johnson.

*a. Statutory Aggravators*

■ As to the three statutory aggravating circumstances, Simmons argues that they were unconstitutionally vague and unsupported by the evidence. This Court has

repeatedly held, though, that the limiting provisions of the depravity of mind aggravator set out in Instruction No. 20, 2(a), (b), and (c) above, satisfy any vagueness concerns; thus, the aggravator is not constitutionally infirm. *State v. Harris,* 870 S.W.2d 798, 813 (Mo. banc 1994). Simmons provides no support for his bare assertion that the potential witness and monetary gain aggravators are unconstitutionally vague. We hold that they are not.

As to the sufficiency of the evidence to support the aggravating circumstances, the test is whether a reasonable juror could reasonably find from the evidence that the proposition advanced is true beyond a reasonable doubt. *Brown,* 902 S.W.2d at 294. Based on the evidence that McClendon was bound at the hands and feet, had a cloth forced down her throat and a ligature tied around her mouth, and was left in this condition in a bathtub, a reasonable juror could find that her murder involved depravity of mind. The potential witness aggravator was properly submitted because a reasonable juror could infer that Simmons foresaw a robbery investigation that had yet to happen and killed Leonora to forestall that development. *Id.* Finally, Simmons' possession of various items of Leonora's after her death provided sufficient evidence to support the robbery aggravator.

*b. Nonstatutory Aggravators*

Simmons asserts that it was error to submit the aggravating circumstance of whether Simmons was found guilty of the murder in the first degree of Cheri Johnson on June 16, 1994, because the finding of guilt had not yet resulted in a final conviction. Under sec. 565.032.1(3), RSMo 1986, however, the trial court was authorized to submit, as a nonstatutory aggravating circumstance, any findings of guilt, even those for which the conviction is not yet final. *See State v. Debler,* 856 S.W.2d 641, 657 (Mo. banc 1993). The trial court committed no error in submitting this instruction.

Simmons also contends that the trial court committed plain error by allowing extensive evidence on the details of the Cheri Johnson crime. In addition to presenting

the testimony of the circuit clerk for the City of St. Louis regarding the guilty verdict in the Johnson case, the State presented several witnesses who testified to the underlying details of Cheri Johnson's murder. Simmons argues that this evidence turned the penalty phase proceeding into an impermissible "mini-trial" for the Johnson murder. Evidence detailing the circumstances of crimes that are submitted as nonstatutory aggravating circumstances, however, is admissible. *Id.* Thus, the trial court committed no error, plain or otherwise, in allowing evidence as to the details of this circumstance.

*c. Plain Error Review of Other Aggravators*

As to the submission of the remaining statutory and nonstatutory aggravating circumstances, Simmons requests plain error review. He asserts that the monetary gain statutory aggravator is vague and unsupported by the evidence. Based on our reasoning related to the robbery aggravator, we find this claim meritless.

Simmons presents no argument on the alleged error in submitting the first and second nonstatutory aggravators. He contends that the third, fourth, fifth, seventh, and eighth nonstatutory aggravating circumstances were presented as mini-trials. A review of the record reveals, however, that only brief testimony was adduced to support these aggravators. He also contends that the seventh and eighth nonstatutory circumstances were inadmissible because they were evidence of unconvicted and uncharged alleged misconduct. Simmons completely ignores this Court's holding that the trial court has the discretion during penalty phase to admit evidence regarding the character of the defendant, including uncharged and unconvicted offenses. *See Kreutzer,* 928 S.W.2d at 874.

In an attack on the ninth nonstatutory aggravating circumstance pertaining to Simmons' history of physical abuse toward women, he claims that the language used was unconstitutionally vague and the allegation unsupported by the evidence. We find that the language used was plain, not vague, and

we further determine that the evidence of the murder of Cheri Johnson, as well as the assaults on two other women, provided sufficient evidence to support the circumstance.

We conclude that Simmons has failed to establish any error on the part of the trial court in the submission of the statutory and nonstatutory aggravating circumstances.

4. Other Penalty Phase Instructional Errors

■■ Simmons contends that the deliberation scheme erected by sec. 565.030, RSMo 1994, is unconstitutional in violation of his rights to due process, trial by jury, and freedom from cruel and unusual punishment. Specifically, Simmons argues that the fact that the jury must first find that the aggravating circumstances are sufficient to warrant the imposition of death before it begins considering balancing the mitigating circumstances against the found aggravating circumstances impermissibly shifts the burden of proof to the defendant. As we have explained in previous cases, however, the jury's decision that the death penalty is *warranted* is not the same as its deciding that it *shall be imposed. State v. Tokar,* 918 S.W.2d 753, 771 (Mo. banc 1996). In fact, the order of proceedings actually presents an advantage to the defendant by requiring the state to completely prove its aggravating case before allowing the jury to even consider application of the death penalty. *Id.* Moreover, it would be illogical to have the jury consider mitigators if it had not first found that the death sentence was warranted, and if it had not found aggravators against which to balance the mitigators. The statute and the instructions based on it meet Simmons' constitutional concerns.

Simmons also claims that Missouri's reasonable doubt definition in the penalty phase instructions is improper. To reiterate our guilt phase discussion, this claim has been repeatedly rejected by this Court. *Kinder,* 942 S.W.2d at 333.

### G. SENTENCING ORDER

■■ Simmons contends that the trial court erred in entering its order of September 30, 1994, sentencing Simmons for the murders of Cheri Johnson and Leonora McClendon because the order was not based solely on the facts and evidence presented during the trials. To support his contention, he directs this Court's attention to the following comment in the sentencing order:

> Willie Simmons was fairly well embarked upon a career which might have rivaled that of the infamous Ted Bundy, but for a sharp-eyed detective, who noticed a florist's distinctive wrapping paper in the apartment of one of the victim's, and a narcissistic propensity to appear in his own photographs.

Simmons argues that the reference to the serial killer shows that the trial court improperly sentenced him based on concern about his future dangerousness. The trial court adequately explained, however, in the Rule 29.15 findings that:

> Taken in context, the Court's reference to Simmons' criminal history as that of an incipient Ted Bundy is not so much a finding concerning Simmons, as it is hyperbole in praise of Detective Maier's police work. In or out of context, however, the reference betrays no inability to render fair judgment, since the career of Willie Simmons at the time the Court wrote its memorandum in September, 1994, included killing two women, assaulting three others, and threatening a female witness against him. The Court does nothing more than observe that this career "might well have rivaled" that of Bundy, had not good police work ... led to his arrest and conviction.

We find no reason to doubt the trial court's explanation of the Ted Bundy reference. The court committed no error in entering its judgment accepting the jury's assessment of punishment for the murders of Cheri Johnson and Leonora McClendon.

### H. CONSTITUTIONALITY OF MISSOURI DEATH PENALTY SCHEME

Simmons offers up the standard objections to the constitutionality of the Missouri death penalty scheme—inadequate proportionality review, unrestricted prosecutorial discretion, and governmental interests. These conten-

tions are again rejected. *See Kinder*, 942 S.W.2d at 339.

## III. ALLEGATION OF RULE 29.15 MOTION COURT ERRORS

In reviewing points on appeal from the denial of postconviction relief, we are limited to a determination of whether the findings and conclusions of the trial court are clearly erroneous. Rule 29.15(m), 29.15(j) (1994); *Tokar*, 918 S.W.2d at 761.

### A. MOTION TO DISQUALIFY TRIAL JUDGE

■■■ Simmons argues that the motion court clearly erred in denying his motion to disqualify Judge Dierker, who presided over the underlying trial, from presiding over the Rule 29.15 proceeding. His grounds for disqualification were Judge Dierker's alleged bias and Judge Dierker's alleged status as a potential witness to some of the Rule 29.15 claims. A disqualifying bias arises if a reasonable person would find an appearance of impropriety and doubt the impartiality of the court. *Kinder*, 942 S.W.2d at 321. To support his claim of bias, Simmons again points to the sentencing order entered by Judge Dierker on September 30, 1994, for the murders of Leonora McClendon and Cheri Johnson. Specifically, Simmons alleges that the Ted Bundy reference, quoted above in Point II.G, and the following paragraphs of that order reveal Judge Dierker's bias:

The Court, ... agreeing wholeheartedly with the sentence recommended by each jury, will deny the motions for judgment of acquittal or new trial and sentence Simmons accordingly....

Upon review of the law and the record, the Court is convinced beyond doubt that each jury's assessment of punishment on the counts in this case is fair, just, reasonable and in accordance with the law. Without wishing to turn a deaf ear in advance to any plea for mercy at allocution, the Court is bound to say that the defendant richly deserves the supreme penalty in this case. The murder of Leonora McClendon was particularly brutal and repulsive, and defendant's future on death row is not likely to be any more

agonizing than Leonora McClendon's death agony in the bathtub following defendant's ministrations; and his end, when it finally comes after the wheels of justice have ground slowly and exceedingly fine, will be merciful in comparison.

Simmons argues in a conclusory fashion that these comments would cause a reasonable onlooker to conclude that the judge was prejudiced, without any attempt to identify the particular bias these comments allegedly reveal. We can see no bias revealed in the above paragraphs that would cause a reasonable onlooker to question the judge's ability to impartially consider Simmons' Rule 29.15 motion. The comments properly express the judge's reasons for agreeing with the jury's recommendation of the death sentence for both murders.

■■■ Simmons also complains that the following statement contained in the Rule 29.15 judgment reveals judicial bias:

The Court was convinced after the jury's verdicts in 1994 that Willie Simmons murdered both women; the Court remains convinced, and reiterates its finding beyond a reasonable doubt that Simmons is in fact guilty of both crimes.

The judge's continued belief after the postconviction hearing that Simmons was guilty does not impinge upon his ability to impartially consider Simmons' Rule 29.15 claims. In what appears to be an additional allegation of bias, Simmons argues that the judge could not fairly judge Simmons' Rule 29.15 claim of incompetency because the judge would be justifying his failure before trial to order a court-ordered mental exam. An interest in upholding trial court actions, though, is not a disqualifying bias. *Wise*, 879 S.W.2d at 523. Simmons' allegations of bias lack any merit.

■■ As to the allegation that the judge should have been disqualified because of potential witness status, the only Rule 29.15 claim identified by Simmons as requiring the judge to be a witness is his claim that judges are assigned to death cases in St. Louis City based on their views on the death penalty. Simmons has failed to assert a compelling

reason to have called the judge as a witness to support this claim at the postconviction hearing. *See id.* The judge did not clearly err in denying the motion to disqualify.

### B. CONSTITUTIONALITY OF RULE 29.15

Simmons argues the motion court clearly erred in denying his constitutional challenge to the time limits imposed by Rule 29.15. This constitutional challenge is again rejected. *See Storey,* 901 S.W.2d at 900.

### C. ATTORNEY SANCTIONS

During the course of postconviction proceedings, the State repeatedly requested that, for various abuses, sanctions be imposed against Simmons' postconviction counsel. After consideration of the State's motions, and after conferencing with counsel from both sides, the postconviction court sanctioned Simmons' counsel, imposing a $250.00 fine. Preliminarily, we reject Simmons' counsel's contention that he did not have adequate notice and opportunity to respond to the motions for sanctions. These motions were properly served upon Simmons' counsel who did indeed respond to the motions; Simmons' counsel responded to these sanction requests, at least insofar as they concerned improper discovery attempts, in various filings.

The court based its sanctions on its findings that the following claims, asserted by Simmons' postconviction counsel, were frivolous, unreasonable and without foundation: (1) that Simmons' trial counsel was ineffective in failing to offer an alternative written instruction on "reasonable doubt;" (2) that exclusion of jurors who were unable to consider the full range of punishment violated the jurors' constitutional rights; (3) that the prosecutor engaged in misconduct; and (4) that Missouri's death penalty is unconstitutional because of prosecutorial discretion. The court also found that Simmons' counsel filed three postconviction discovery motions "solely for the purpose of harassing or vexing the State in the defense of the postconviction motion...."

Rule 55.03(b) states, *inter alia,* that by filing a pleading, motion, or other paper with a court, the attorney or party is certifying that the claims presented are not intended to harass or cause unnecessary delay, are warranted by existing law or nonfrivolous argument for the extension, modification, or reversal of existing law, and have evidentiary support or are likely to have support after a reasonable opportunity for further investigation or discovery. Rule 55.03(c) provides that sanctions may be imposed for violations of Rule 55.03(b). This rule applies to postconviction proceedings. *Thurman v. State,* 859 S.W.2d 250, 254 (Mo. App.1993). Because the imposition of sanctions is not an action upon a Rule 29.15 motion as described in Rule 29.15(j) (1994), we review the decision for abuse of discretion. *See State v. Duong,* 935 S.W.2d 87, 88 (Mo.App.1996); *State v. Gardner,* 932 S.W.2d 858, 862 (Mo.App.1996).

From our review of the record, the postconviction court did not abuse its discretion in imposing these sanctions on Simmons' counsel. Three of the claims cited, those concerning the reasonable doubt instructions, the death penalty constitutionality, and juror disqualification, have been firmly and uniformly rejected by previous decisions of this Court and the federal courts. *See State v. Chambers,* 891 S.W.2d 93, 105, 113 (Mo. banc 1994) (reasonable doubt, constitutionality of death penalty); *State v. Harris,* 870 S.W.2d 798, 805–06 (Mo. banc 1994) (juror disqualification); *Davis v. Georgia,* 429 U.S. 122, 122–23, 97 S.Ct. 399, 399–400, 50 L.Ed.2d 339 (1976) (juror disqualification); *Murray v. Delo,* 34 F.3d 1367, 1381–82 (8th Cir.1994) (reasonable doubt instruction); *Battle v. Delo,* 19 F.3d 1547, 1562 (8th Cir.1994) (death penalty constitutionality). In his postconviction motion, counsel did not present arguments designed to confront and refute these decisions. Rather, he simply rehashed the arguments that these decisions had already rejected. This practice does not constitute "a nonfrivolous argument for the extension, modification, or reversal of existing law...." Rule 55.03(b)(2). Counsel's assertion that preservation of these claims for federal review warrants their inclusion in the Rule 29.15 motion is unconvincing. Preservation

of these claims is unnecessary because, as stated, the federal courts have rejected these same claims in other cases. Had the federal courts not rejected the claims previously, counsel's argument would be much more tenable. But to preserve the claims in the mere hope that the federal courts might someday change their position would effectively preclude any claim from ever being frivolous and would render Rule 55.03(b) inoperative in all cases where federal review is possible. In short, this Court will not allow counsel to escape sanctions under Rule 55.03(b) merely by invoking the words "federal review."

The general allegations concerning prosecutorial misconduct at trial were unsupported by citations to the trial transcript or record both of which were fully available to Simmons' counsel.[3] Simmons does not explain how or why further investigation or discovery would be likely to uncover such misconduct. Therefore, the postconviction judge did not abuse his discretion in finding that these allegations violated Rule 55.03(b)(3).

Undoubtedly, sanctioning an attorney under Rule 55.03(c) is a serious matter and should only be undertaken after careful consideration of the circumstances of the attorney's actions and the case before the court. We find that the trial judge undertook such careful consideration. Although no single violation of Rule 55.03(b) as found by the postconviction court necessarily warrants the imposition of the sanctions, the several violations, when viewed as a whole, support the $250.00 fine.

### D. INEFFECTIVE ASSISTANCE OF COUNSEL

■■■■ Simmons makes several allegations of ineffective assistance of counsel. We address only those allegations that have not been rendered moot by our rejection of the underlying claims of error. To win reversal of his conviction or death sentence because of ineffective assistance of counsel, Simmons must show that his counsel's performance was deficient, i.e. below the degree of skill, care, and diligence of a reasonably competent attorney, and that the deficiency prejudiced his defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *Tokar,* 918 S.W.2d at 761. Indeed, he must show that his counsel failed both the performance and prejudice prongs of the *Strickland* test, and if he fails to satisfy either prong, we need not consider the other. *Sidebottom v. State,* 781 S.W.2d 791, 795–96 (Mo. banc 1989), *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3295, 111 L.Ed.2d 804 (1990). In reviewing the performance prong, Simmons must overcome the presumptions that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment. *Strickland,* 466 U.S. at 689–90, 104 S.Ct. at 2065–66. Counsel's actions that constitute sound trial strategy are not grounds for ineffective assistance claims. *Storey,* 901 S.W.2d at 893. To prove prejudice, Simmons must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *Tokar,* 918 S.W.2d at 761. Finally, the determinations of the motion court will not be disturbed unless they are clearly erroneous. Rule 29.15(m), 29.15(j) (1994); *Sanders v. State,* 738 S.W.2d 856, 857 (Mo. banc 1987).

### 1. Simmons' Competency to Stand Trial

■■■■ Simmons contends that trial counsel was ineffective for failing to adequately investigate and present to the trial court the possibility that Simmons was incompetent to proceed to trial. Before his trial, Simmons' trial counsel had access to reports from four mental health professionals: (1) Dr. Daniel; (2) Dr. Fleming; (3) Dr. Parwatikar; and (4) Dr. Peterson. The reports by Dr. Daniel and Dr. Fleming had been completed in connection with Simmons' original trial for the murders of both Johnson and McClendon. Dr. Daniel determined that Simmons had no diagnosable psychiatric disorder, but Dr. Fleming reported that Simmons suffered

---

**3.** Simmons' counsel did specifically allege two instances of conduct, one relating to the prosecutor's distribution of campaign literature, and one referring to his disqualification of Judge Peek.

While these incidents were not found to constitute misconduct, they were sufficiently specifically alleged to comport with Rule 55.03(b).

from a delusional disorder that rendered him incompetent to proceed.

Drs. Parwatikar and Peterson were appointed during preparation for Simmons' separate trials for the murders of Johnson and McClendon. Dr. Parwatikar concluded that Simmons was competent to proceed to trial. This conclusion was based solely on the reports and data of others because Simmons refused to participate in an examination. Likewise, Simmons was uncooperative with Dr. Peterson. Dr. Peterson did issue a report but was unable to address the issue of Simmons' competency to stand trial.

After his separate trials, Simmons received additional examinations in preparation for the Rule 29.15 proceeding. Dr. Peterson again examined Simmons and this time concluded that he was not competent to assist his attorneys. Simmons was also evaluated by Dr. Harry, a psychiatrist appointed on the motion court's own motion. Dr. Harry concluded that Simmons had a mental disease or defect but was competent to stand trial, both at the time of the evaluation and at the time of his trials. He determined that Simmons understood the proceedings against him based on the following factors: (1) he was able to describe the roles and functions of the major participants in courtroom proceedings; (2) he was aware of various legal defenses available to him; (3) he was aware of legal strategies including guilty pleas to lesser charges; (4) he understood court procedures; (5) he appreciated the charges against him as first degree murder; (6) he appreciated the range and nature of possible penalties should he be convicted; and (7) he was aware of the possible outcome. He also determined based on numerous additional factors that Simmons had the ability to assist his attorneys.

Simmons contends that trial counsel was ineffective for failing to conduct additional pretrial investigation into his competency to stand trial. However, trial counsel already had four mental health reports on Simmons. Further, Simmons had refused to cooperate with at least three of the psychiatrists that counsel had obtained to assist in the investigation, so counsel had no reason to believe that Simmons would cooperate with any other mental health experts. Under these circumstances, counsel's failure to pursue additional investigation into Simmons' competency status cannot be deemed unreasonable.

Simmons also accuses trial counsel of ineffectiveness in failing to present the issue of competency to the trial court. The conflicting reports that were available on Simmons' mental status, however, provided little assistance in evaluating his competency. Moreover, trial counsel testified at the postconviction hearing that based on their extensive dealings with Simmons they believed that he did understand the proceedings against him and that he was able to assist them. We find that counsel's performance was not deficient. In addition, we agree with the motion court's conclusion that Simmons was not prejudiced because he was competent to proceed to trial. The report of Dr. Harry fully supported the conclusion that Simmons was competent. The motion court found that Dr. Peterson's testimony lacked credibility and, therefore, rejected his finding of incompetency. We give deference to the motion court's superior opportunity to judge the credibility of the witnesses. *State v. Twenter,* 818 S.W.2d 628, 635 (Mo. banc 1991).

We conclude that the motion court did not clearly err in denying Simmons' claims that his trial counsel was ineffective with regard to the competency issue.

## 2. Failure to Object to Voir Dire Comments

Simmons claims that trial counsel was ineffective for failing to object to the following comments of the trial judge during voir dire: (1) in explaining jury instructions—"And if this sounds like signing on to a game, the rules of which will be told to you at the end, that's about what it is, and we need to know if you can't stand that"; (2) in talking about jury sequestration—"I'm trying to think, are there any other good points that I can bring to your attention, other than the fact that it is paid for by the taxpayers"; (3) in responding to venireperson's concern about time—"Believe me, I don't want to see it run too many days past the 8th either"; (4) in addressing venire panel at completion of

voir dire—"The bad news is that the lawyers have to huddle before we can settle on the lucky sixteen who will join us on Monday"; and (5) in addressing jury panel—"the Bailiffs, [will] introduce you to your luxurious jury room on the ground floor, which you will grow to hate in short order, but I thank you for your patience and your continued patience."

We find that all of the above remarks were entirely proper. The motion court aptly noted that most of "the remarks were nothing more than reasonable attempts by the Court to use humor to alleviate the tedium of voir dire and did not, as a matter of fact, have the direct or indirect effect of forcing the sitting juries to hasten deliberations or otherwise act unfairly." Trial counsel did not act deficiently in failing to object to the above comments; thus, the motion court did not clearly err in denying this ineffective assistance of counsel claim.

■ Simmons also claims that trial counsel was ineffective for failing to object to numerous comments by the prosecutor during voir dire. These comments include: (1) a statement by the prosecutor that the State and himself, as the State's representative, were seeking the death penalty; (2) a question as to whether the venirepersons could impose the death penalty if the murder was proved beyond a reasonable doubt and "good" aggravating circumstances outweighed mitigating circumstances; (3) a question as to whether the venirepersons could consider voting for death if "good" aggravating circumstances were proven; (4) a statement that mitigating circumstances must not outweigh aggravating circumstances in order to impose the death penalty; (5) a statement that what makes Simmons guilty is the evidence presented that the jurors believe beyond a reasonable doubt; (6) a statement that venirepersons should not think that the penalty phase would never happen; and (7) a statement that if jurors decide that the State has ultimately proven everything it is supposed to, Simmons gets the death penalty. Simmons argues that these comments misled the jury, inaccurately stated the law, sought a commitment, and implied additional facts outside the record.

We do not agree with his characterization of the above remarks. Further, he has made no attempt to overcome the presumption that the failure to object was not reasonable trial strategy or to identify the prejudice resulting from the remarks. The motion court did not clearly err in denying this claim of ineffective assistance of counsel.

### 3. Failure to Object to Remarks in Guilt Phase

Simmons claims that trial counsel was ineffective for failing to object to and/or preserve for appellate review numerous statements made during the guilt phase arguments. He complains of the following remarks in the State's opening statement: (1) characterization of McClendon's homicide as "murder"; and (2) that the "evidence shows circumstantially ... that [Simmons] ... alone is the killer."

In addition, Simmons complains of the following statements in the State's closing argument: (1) "You're the people that have to feel confident and comfortable in your decision, both in your first decision and in your second decision"; (2) speculation that McClendon would have "spent days dying" if the gag had not been shoved all the way down her airway; (3) speculation that Simmons had Fay's Furniture pawn ticket in his wallet when he was interviewed on October 29; (4) "if all these decisions aren't cool reflection on you want this person to die, then let me tell you nothing ever is"; (5) "If not in this brutal murder case, if not with this piece of evidence, then when?"; (6) "The police did a good job here"; (7) detectives were "doing their job" when they interviewed Simmons on July 3; (8) "Do the right thing here for yourselves, for our community, for Leonora McClendon and her family"; (9) "But I would think if you're going to murder somebody pretty well the way to do it is shove a rag down as far as they can get it.... I would think that's probably how you would do it"; (10) "Let me tell you something. Why do you think I placed [the ligatures] in plastic bags? ... You want a whiff of something that's really rank? ... Take a whiff of those. Don't even have to open the baggy, advise you really not to open

the bag it's pretty powerful"; and (11) Carla Naert "can be concerned about her safety and you should—I've got [a] daughter that—you know, I'm concerned about safety."

We have reviewed the above arguments and determined that counsel was either not deficient for failing to object or that no prejudice resulted from the failure to object; thus, trial counsel was not ineffective. An extended analysis of each statement would offer no precedential value. Simmons' related claim that the prosecutor engaged in misconduct in making the above statements is meritless. This point is denied.

### 4. Penalty Phase Evidence

#### a. Mental Health Evidence

■ Simmons contends trial counsel was ineffective for failing to adequately investigate and present evidence of a mental disease or defect during the penalty phase. As outlined above, four mental health professionals completed evaluations of Simmons' mental health status. Simmons now contends that if trial counsel had provided the mental health professionals with more information, they would have been able to render more complete diagnoses that would have been helpful in the penalty phase. He ignores the statements in the reports of Drs. Parwatikar, Fleming, and Peterson that the reason they could not give a more complete diagnosis was Simmons' failure to cooperate in the examination process. Simmons is now attempting to blame his attorneys for the incomplete evaluations, when it is clear that the lack of a complete evaluation was due to his own voluntary actions. Further, in spite of Simmons' uncooperative nature, his trial counsel was able to obtain a report from Dr. Peterson that focused on relevant mitigating factors. Under these facts, we agree with the motion court's conclusion that Simmons' trial counsel conducted a reasonable investigation of his mental status.

■ Simmons also asserts that counsel was ineffective for failing to present available mental health information as mitigating evidence. In particular, he insists that counsel should have called Dr. Peterson to testify that Simmons suffered from a "mental disease or defect; a severe cognitive disorder; low intellectual functioning; and a severe personality disorder." Nevertheless, trial counsel testified at the postconviction hearing that a strategic decision was made not to call Dr. Peterson during the penalty phase because his report would have been disclosed to the State and portions of it were particularly damaging to Simmons. Specifically, Dr. Peterson had noted that Simmons displayed "anger at women," that he linked statements of "love with precipitous physical aggression," and that "his own control over the switch from affection to physical violence after rejection or criticism was virtually nonexistent."

Although Simmons emphasizes the need for mitigating evidence and discounts the harm that such evidence might cause him, we agree that Dr. Peterson's testimony would likely have reinforced the State's portrayal of Simmons as a predator who was violent towards women. As stated by the motion court:

> The last thing Simmons needed in defending a circumstantial case was psychiatric evidence which would demonstrate that he was psychologically capable, if not predisposed, to precisely the kind of violence against women which the State was positing.... It was entirely reasonable for [trial counsel] to conclude that delving into Simmons' psyche in front of a jury would be aggravating, not mitigating, and would play directly into the State's hands.

It is clear that in this case Simmons has failed to overcome the presumption that trial counsel's decision not to pursue mental health evidence as a mitigating factor was sound trial strategy.

We find that the motion court did not clearly err in concluding that trial counsel was not ineffective in the investigation or presentation of Simmons' mental health status.

#### b. Background Evidence

■ Simmons also asserts that his penalty phase defense was insufficient for lack of presentation of mitigating evidence concerning his background and upbringing. His mit-

igating defense consisted solely of his mother's testimony which emphasized the fact that she loved her son, missed him at holidays, would continue to love him if he served life in prison, and would draw value from a continued relationship with him. The defense strategy was not to seek mercy for Simmons' sake, but to demonstrate that there was a person, his mother, who would draw value from Simmons' continued existence, and who would suffer a loss from his death.

Simmons now argues that defense counsel should have offered more extensive mitigating evidence. He raises many aspects of his childhood (and his parents' childhood) which he considers as "mitigating." [4] These include both positive and negative aspects of his life. He cites, for example, both the fact that he enjoyed art as a grade school student and the fact that he had to repeat grades in grade school.

During the penalty phase of Simmons' first murder trial, defense counsel had, in fact, placed much of this information before the jury. That jury, however, decided that the information did not mitigate the aggravating circumstances and sentenced Simmons to death. Considering that the strategy had once failed, and that calling Simmons' relatives to testify about his upbringing would inevitably highlight the fact that his brother had endured the same upbringing yet had become a successful doctor, we agree with the reasoning of the Rule 29.15 court:

> In light of all the information available to them, after discussion with their client, trial counsel decided to rely at penalty phase solely on a plea for mercy from Simmons' mother. This decision was premised on the demonstrated ineffectiveness of prior strategy concerning mitigating circumstances, which had sought to use testimony from [a person who went to church with Simmons' mother] and one of

Simmons' previous work supervisors, the belief that comparisons by the jury between Simmons and a successful sibling ... would be harmful, and the conclusion that the mother's plea was the best hope.... In the final analysis, 1994 trial counsel concluded, rightly, that delving too deeply into Simmons' social history and upbringing would do more harm than good, by opening up dangerous avenues for the State to explore: "areas of danger," in [defense counsel's] words.

The penalty phase course of action was clearly sound trial strategy and, therefore, does not constitute ineffective assistance of counsel. *See Storey,* 901 S.W.2d at 893.

5. Failure to Object to Penalty Phase Arguments

Simmons also claims that trial counsel was ineffective for failing to object to and/or preserve for appellate review numerous statements made during the penalty phase arguments. Simmons complains of the following statements in the State's closing argument: (1) "this is, frankly speaking, where I expected we would be when I started talking to you Monday before last, because I knew what the facts were in this case"; (2) "As the judge has indicated to you, the pivotal instruction here is the instruction that deals with aggravating circumstances"; (3) "Thank God she gagged or her airway was occluded, because otherwise you know what? She would have laid there for days until she starved to death, if she had not already been ligatured"; (4) jury could find statutory aggravator that "Leonora McClendon was a potential witness in an investigation"; (5) "Two of them died, the others didn't, probably because they had other people around to help them out"; (6) "Now [Simmons'] rights have been vindicated here. He has had the opportunities through his attorneys to see that the state has proven its case in every respect, to see that the witnesses are cross-examined. Where is the

---

**4.** The background/upbringing information included, *inter alia:* (1) his parents came from the poor, racist South; (2) his mother was strict with him and sometimes beat him; (3) his father had a possible drinking problem; (4) his parents fought and Simmons sometimes tried to intervene; (5) his mother joined a restrictive religion and tried to get Simmons to join, also; (6) he,

alternatively, either enjoyed school and did adequately, or did poorly in school; (7) he ran away from home at age 12 or 13 and was assaulted in Chicago; and (8) a judge's comments at a 1980s plea hearing, in which the judge said that Simmons had been one of her "good kids on probation."

justice for Leonora McClendon? Where is the justice for Cheri Johnson?"; (7) "All his rights, everything, every protection that could be afforded him has been done and now, now you should say give him mercy?"; (8) "Our young people are dying left and right. Our young, decent people are being picked off, are being tied up, thrown away like so much rubbish, and here is one of the men that are doing it"; (9) "We need to do what is the right and just thing for both him, for Leonora McClendon, for Cheri Johnson, Michellee Aldridge, Jane Davis, Norma Whiteside, if not in this case should he get death, then in what case? Then when?"; (10) "Please speak with your verdict with justice and finality so that these families can go on with their lives now, resting assured that their daughters' deaths have been punished appropriately, with the death of their killer"; (11) "Mitigating circumstances must be unanimously found. Each of you must find one to overcome the aggravating circumstance"; and (12) "the loss of these two young ladies has torn a hole in the soul and the fabric of these families and their lives.... Mr. Johnson was in this world and his daughter was his future. Her dreams were his dreams."

He also complains of the following remarks:

Every day of the life of Ardella Johnson she will remember that she gave her engagement ring to her daughter to keep for her so that one day she could use it, could have it, that she might get married, that she might have children. That will never ever occur. Nor will the nightmares or the thoughts of Cheri Johnson's parents ever cease, because they too know that their daughter died alone where she should be safe in her own apartment by being bludgeoned and strangled to death. They cannot and will not ever forget that.

As with the guilt phase arguments, we have reviewed the foregoing penalty phase arguments and determine that counsel was either not deficient for failing to object or that no prejudice resulted from the failure to object. An extended analysis of each statement would offer no precedential value. Simmons' related claim that the prosecutor engaged in misconduct in making the above statements is also meritless. This point is denied.

6. Depravity of Mind Aggravator

Simmons argues that trial counsel was ineffective during penalty phase closing argument in discussing the depravity of mind statutory aggravator when he stated "I think the first thing if you read that quickly you might say to yourself that that's extremely vague circumstance, that basically you could basically say that all killings are outrageously and wantonly vile, horrible and inhuman." Simmons contends that by this remark, trial counsel conceded that the depravity of mind aggravator existed. He ignores, however, the fact that trial counsel then explained in detail to the jury the factors it would have to consider before it could find that the depravity of mind aggravator existed. His remarks, taken as a whole, emphasized to the jury that the aggravator might at first seem confusing but that the limiting definitions in the instruction provided the necessary guidance for the jury. Counsel's performance was not deficient. The motion court did not clearly err in denying this ineffective assistance of counsel claim.

## IV. PROPORTIONALITY REVIEW

Under sec. 565.035.3, RSMo 1994, this Court is required to review the proportionality of the sentence of death imposed in this case. There is no evidence in the record that Simmons' sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. The record also shows that the four statutory aggravating circumstances found by the jury are supported by the evidence.

We further find that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, considering the circumstances of the crime, the strength of the evidence and the defendant's history. Simmons bound the hands and feet of his victim, shoved a gag down her throat, and left her to suffocate in her own bathtub. He then stole several personal items from her apartment. The sentence of death is consistent with other cases where the victim was brutally killed or where the killing was

done in connection with receiving a monetary gain. *See, e.g., State v. Kreutzer,* 928 S.W.2d 854 (Mo. banc 1996) (affirming death penalty where defendant committed murder during perpetration of burglary and for purpose of monetary gain); *State v. Brown,* 902 S.W.2d 278 (Mo. banc 1995) (affirming death penalty where victim was bound up and strangled).

## V. CONCLUSION

For the above reasons, the judgments are affirmed.

All concur.