# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2663

_____

Willie Simmons,                          *
                                         *
                    Appellant,           *
                                         *
         v.                              *
                                         *
Allen Luebbers,                          *
                                         *
                    Appellee.            *

Appeals from the United States
District Court for the
Eastern District of Missouri.

_____

No. 01-2699

_____

Willie Simmons,                          *
                                         *
                    Appellant,           *
                                         *
         v.                              *
                                         *
Al Luebbers,                             *
                                         *
                    Appellee.            *

_____

Submitted:  March 11, 2002

Filed:  August 14, 2002

_____

Before McMILLIAN, HEANEY, and MORRIS S. ARNOLD, Circuit Judges.
_____

HEANEY, Circuit Judge.

Willie Simmons appeals from the district court's denial of his petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] We affirm in part and reverse in part.

I.    BACKGROUND

Simmons was convicted in a single trial of two counts of capital murder following the deaths of Leonora McClendon and Cheri Johnson. Following the jury's recommendation, the trial court sentenced Simmons to death on both counts.  The Missouri Supreme court then overturned the two convictions on the grounds that the murder charges should not have been tried together.  See State v. Simmons, 815 S.W.2d 426 (Mo. 1991) (en banc).  On remand, Simmons was tried separately for both murders.  He was convicted and sentenced to death after each trial.

Simmons filed two separate motions for post-conviction relief with the trial court.  After both sides presented evidence and Simmons underwent a psychiatric examination by a court appointed examiner, the trial court denied both motions.  The Missouri Supreme Court affirmed the denial of Simmons's motions for post-conviction relief and affirmed both convictions and sentences. See State v. Simmons, 955 S.W. 2d 729 (Mo. 1997) (en banc) (Johnson murder) (hereinafter "Simmons I");

_____

[1]Although these two appeals were filed separately and heard back-to-back by this court, we have consolidated the discussion of Simmons's claims in a single opinion.

State v. Simmons, 955 S.W.2d 752 (Mo. 1997) (en banc) (McClendon murder) (hereinafter "Simmons II").

On February 22, 1999, Simmons filed two habeas petitions pursuant to 28 U.S.C. § 2254. The district court denied both petitions and granted a certificate of appealability on twelve of the twenty-eight issues presented in the petitions.[2] These appeals followed.

## II.   DISCUSSION

Our consideration of Simmons's appeals is governed by 28 U.S.C. § 2254 (1994 & Supp.1998), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1218-19. "Under § 2254(d)(1), the writ may issue only if . . . the state-court adjudication resulted in a decision that (1) 'was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States.'" Copeland v. Washington, 232 F.3d 969, 973 (8th Cir. 2000) (quoting Williams v. Taylor, 529 U.S. 362, 412 (2000)(O'Connor, J., concurring). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. (quoting Williams, 529 U.S. at 412-13). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct

---

[2]The facts underlying Simmons's convictions are discussed extensively in the opinions of the Missouri Supreme Court, and in the district court's orders denying relief on Simmons's petitions. See Simmons I, 955 S.W. 2d 729; Simmons II, 955 S.W.2d 752; Simmons v. Bowersox, No. 4:97CV2537 (E.D. Mo. March 30, 2001); Simmons v. Bowersox, No. 4:97CV2538 (E.D. Mo. March 30, 2001).

governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. (quoting Williams, 529 U.S. at 413). In addition, the Anti-terrorism and Effective Death Penalty Act of 1996 provides that relief may not be granted to a person in state custody unless the underlying state proceeding "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Sexton v. Kemna, 278 F.3d 808, 811 (8th Cir. 2002) (quoting 28 U.S.C. § 2254(d)); see also Johnston v. Luebbers, 288 F.3d 1048, 1051 (8th Cir. 2002).

A.

Simmons argued to the Missouri Supreme Court that his trial attorneys were constitutionally ineffective because they failed to adequately investigate and present to the trial court evidence of his lack of mental capacity during the guilt phase of the McClendon trial. Simmons now argues that the Missouri Supreme Court's decision was an unreasonable application of clearly established federal law because Simmons's mental health raised questions as to whether he was competent to stand trial, and because Simmons's trial attorneys failed to uncover additional available evidence that would have cast doubt on his ability to comprehend the nature of the proceedings against him. In our view, the Missouri Supreme Court did not err in its analysis of this issue.

As noted by the Missouri Supreme Court, the proper analysis for evaluating an ineffective assistance of trial counsel claim is set forth in Strickland v. Washington, 466 U.S. 668 (1984). To prove a claim of ineffective assistance of counsel, Simmons must demonstrate both that his attorneys' performance was deficient, and that his attorneys' deficient performance prejudiced his defense. Bryson v. United States, 268 F.3d 560, 561 (8th Cir. 2001) (citing Strickland, 466 U.S. at 687; Steinkuehler v. Meschner, 176 F.3d 441, 445 (8th Cir. 1999). To establish the first prong of the Strickland test, Simmons must show that his attorneys' representation fell below the

"'range of competence demanded of attorneys in criminal cases.'" Strickland, 466 U.S. at 688 (quoting McMann v. Richardson, 397 U.S. 759 770-71 (1970). Trial counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. However, there is a strong presumption that counsel rendered adequate assistance and that counsel's challenged actions were part of a sound trial strategy. Id. at 689-90. Further, to establish the prejudice prong of the Strickland test, Simmons must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

Prior to the McClendon trial, Simmons's trial attorneys acquired reports from four mental health professionals. The first was prepared by Dr. Daniel, who performed a psychiatric evaluation of Simmons in 1990. Dr. Daniel found that Simmons did not show evidence of memory or other cognitive problems, and determined that Simmons did not have a diagnosable psychiatric disorder.

Dr. Fleming also performed a psychological evaluation of Simmons in 1990. Dr. Fleming noted that Simmons was unwilling to participate in the examination. Simmons apparently refused to respond to any questions that he felt to be intrusive, and exhibited mistrust of psychologists. This made it impossible to complete the evaluation. Nevertheless, Dr. Fleming concluded that Simmons had a low borderline intelligence. Dr. Fleming also noted that Simmons had gaps in his memory, evidenced in part by his denial that he ran away to Chicago during his childhood and was assaulted at a bus station. According to Dr. Fleming, Simmons understood the charges against him, and the possible penalties that he faced. He also understood the basic court process. However, Dr. Fleming opined that Simmons was not able to understand his arrest, trial, and the role of his attorneys because of his paranoia and mistrust of attorneys. Dr. Fleming believed that Simmons's delusions made him

unable to understand the seriousness of his sentence, and that his paranoia prevented him from disclosing important information that might be of value to his attorneys. Dr. Fleming concluded that Simmons was incompetent to stand trial because of his mental status, and that his paranoia and mental illness made him unable to assist his attorneys or to rationally understand the issues.

Dr. Parwatikar and Dr. Peterson were appointed to examine Simmons before Simmons's separate trials for the murders of Johnson and McClendon. Dr. Parwatikar's report was based on the reports and data procured by other psychologists because, as the examination was about to begin, Simmons refused to be interviewed and demanded to be returned to his cell. Dr. Parwatikar concluded that Simmons was competent to proceed to trial. Dr. Peterson's report focused on mitigation issues because Simmons refused to participate in the examination. Dr. Peterson did not address Simmons's competency to stand trial.

Simmons contends that his trial attorneys were ineffective for failing to conduct an additional pretrial investigation into his competency to stand trial. The Missouri Supreme Court concluded that because Simmons's trial attorneys already possessed four mental health reports on Simmons, and because Simmons refused to cooperate with at least three of the psychiatrists that his attorneys had obtained to examine him, his attorneys' failure to conduct an additional investigation into his competency status was not unreasonable. See Simmons II, 955 S.W.2d at 773. This was a reasonable application of the Strickland standard. Simmons's 1994 trial attorneys conducted an adequate investigation of Simmons's mental health status. Dr. Daniels successfully evaluated Simmons, and Drs. Fleming, Peterson, and Parwatikar tried, but were unable to do so because Simmons refused to cooperate. Further, Simmons's attorneys testified that throughout their extensive interactions with Simmons, they had not observed any unusual behavior, nor had they encountered any difficulty in communicating with Simmons. At the time of the McClendon trial, it was reasonable for Simmons's attorneys to assume that further attempts to evaluate

-6-

Simmons's competency would have been futile because of his refusal to cooperate. It was also reasonable for Simmons's attorneys to assume that more extensive psychiatric evaluations could have produced information harmful to any future attempts to portray Simmons as incompetent, because several examining physicians had already reached a contrary conclusion.

Simmons also alleges that his trial attorneys acted ineffectively when they failed to present the issue of his competency to the trial court. However, as noted above, the available reports on Simmons's mental status prior to the McClendon trial failed to conclusively indicate that Simmons was not competent to proceed to trial. Further, it does not appear that Simmons was prejudiced by his attorneys' inaction.

In 1995, Dr. Harry was appointed by the Missouri trial court in connection with Simmons's Rule 29.15 proceedings to conduct a psychiatric evaluation of Simmons. Dr. Harry was instructed to evaluate Simmons to determine whether he was suffering from a mental disease or defect that caused him to be unable to understand the nature of the proceedings against him, or to assist in his own defense. After reviewing the reports from Simmons's previous examinations, and after evaluating Simmons, Dr. Harry concluded that Simmons was competent. Dr. Harry determined that Simmons was aware of his legal defenses and the various strategies available to him, that he understood the court procedures, and that he appreciated the range of possible penalties in the event he was convicted of first degree murder. Dr. Harry also concluded that numerous other factors indicated that Simmons was competent to assist his attorneys. The post-conviction court determined that Dr. Harry's opinions and testimony were credible and sound. See Simmons v. State, No. 881-00036, slip op. at 38 (Mo. Cir. Ct. Aug. 9, 1995).

In contrast, Dr. Peterson testified at Simmons's post-conviction hearing that after evaluating Simmons a second time in connection with the Rule 29.15 proceedings, he was able to determine that Simmons was not competent to assist his

attorneys. However, the post-conviction court rejected Dr. Peterson's opinion, noting that it had "seldom encountered an expert displaying less credibility in a given case . . ." Id. The post-conviction court observed Dr. Peterson as he testified, and concluded that he was "an advocate" who had an "evasive and incredible" demeanor when cross-examined about differences between his diagnosis and that of Drs. Fleming and Daniels. Id. at 39.

Simmons has failed to bring to our attention any Supreme Court cases with facts similar to those in the present case to support his assertion that the Missouri Supreme Court erred when it denied relief on this claim. Further, because of the conflicting diagnoses presented by the examining physicians, and because of Dr. Peterson's apparent lack of credibility, see generally Chadwell v. Koch Refining Co., L.P., 251 F.3d 727, 734 (8th Cir. 2001)(noting that trial court is closer to the evidence and better equipped to make credibility determinations), we believe that the Missouri Supreme Court reasonably applied the Strickland standard when it determined that Simmons's attorneys acted effectively despite their failure to pursue the issue of Simmons's competency to stand trial.

B.

Next, Simmons contends that he received ineffective assistance of counsel during the penalty phase of the McClendon trial because his attorneys did not introduce available mental health information or mitigating evidence in an attempt to persuade the jury to spare his life.

As outlined above, four mental health professionals completed evaluations of Simmons's mental health status prior to the penalty phase. Only one of these mental health professionals concluded that Simmons was incompetent. However, the evaluations uncovered character and background issues that his attorneys could have presented to the jury as mitigating evidence during the penalty phase.

For example, after Dr. Daniel examined Simmons in 1990, he reported that Simmons was raised in poverty and that his mother was extremely religious and very strict. When Simmons was a child, he ran away from home and was assaulted at a bus terminal in Chicago. Although he refused to discuss the assault with his parents, he appeared to have been beaten, and professed that he would never "let anyone hurt him again." Simmons refused to discuss this episode during his psychological evaluations.

Simmons was also examined by Dr. Shopper in connection with the post-conviction proceedings. Dr. Shopper stated:

> [A] significant event about which too little is known, is when [Simmons] stole $125.00 from his parents, [and] took a bus to Chicago where he was apparently robbed and beaten up in a bathroom. . . . Characteristically, he avoided talking about his three days there and instead created a benign cover story which manifestly fails to explain either his motivation or the events of that three day period. Although he refused to talk about it, it was noted that his face looked beaten up, he had a split lip and told either his mother or sister, ""I'll never let anyone hurt me again." By all accounts he was traumatized . . . . [Simmons's parents] did not investigate the matter any further . . . despite their having noticed a rather marked change in his behavior and his aggressivity.

> . . .

> The most likely assumption is that [Simmons] was homosexually victimized in addition to having his money stolen. If only he were robbed and beaten up there would be far less shame about his victimization and a much greater tendency to tell his parents . . . what had happened. It may well be that [Simmons's} frequent and seemingly endless provocations . . . may be connected to [his] traumatization at age twelve.

. . .

-9-

It may also help us understand his inappropriate behavior with several women. . . . [T]he homosexual rape of a young teenager, when untreated and unrecognized, may cause serious psychological problems in adult life and may have a strong impact on determining psychological defensive structures and configurations. All things being equal, the effect of a homosexual rape in a male is even more serious psychologically than a comparable heterosexual rape in a woman of a same age.

June 30, 1999 Report of Moisy Shopper, at 3-4, <u>Simmons v. State</u>, No. 881-00036, slip op. at 38 (Mo. Cir. Ct. Aug. 9, 1995).

In addition, in 1994, Simmons's attorneys possessed the first report of Dr. Peterson. In that report, Dr. Peterson disclosed that Simmons's parents' marriage was turbulent and permeated by frequent verbal and physical fights in front of Simmons and his siblings. When Simmons was eleven, he unsuccessfully tried to intervene in a physical confrontation between his father and mother. Further, during Simmons's childhood, he was repeatedly spanked by his mother with rulers, straps, and belts as part of her effort to discipline him. This often left welts and bruises on Simmons's body. Although he was toilet trained, he frequently wet himself when his mother beat him and also when he feared that he was about to be beaten. He was routinely beaten by his mother until he was 17 years of age.

The Missouri Supreme Court rejected Simmons's contention that his attorneys were ineffective for failing to introduce this evidence during the penalty phase of the McClendon trial. <u>See</u> <u>Simmons II</u>, 955 S.W.2d at 775. It concluded that Simmons's attorneys could not be blamed for failing to introduce Dr. Peterson's report because certain portions would have been damaging to Simmons. Specifically, Dr. Peterson noted that Simmons displayed "anger at women," that he linked statements of "love with precipitous physical aggression," and that "his own control over the switch from affection to physical violence after rejection or criticism was virtually non-existent." <u>Id.</u> The Missouri Supreme Court concluded that Dr. Peterson's testimony would

-10-

likely have reinforced the state's portrayal of Simmons as a predator who acted violently towards women.  Id.

In our view, the Missouri Supreme Court's decision is deficient.  The jury was already aware of Simmons's anger towards women.  Peterson's report would have introduced the possibility that Simmons's inability to control his violent behavior was caused by childhood trauma and abuse.  This information could have been used in his favor at the penalty stage.  Instead, the jury was allowed to conclude that Simmons's violent behavior was simply the result of his wicked and aggressive nature.

Because Dr. Peterson's report could have been used to bolster the state's position, however, we cannot say that the Missouri Supreme Court's decision was an unreasonable application of the Strickland standard.  See Strickland, 466 U.S. at 687 (noting that a court must find an attorney's performance was deficient and that the deficient performance prejudiced the defense).  The Missouri Supreme Court properly noted that Dr. Peterson's report contained potentially harmful information about Simmons's anger towards women.  It was therefore reasonable for Simmons's attorneys to make a strategic decision to refrain from introducing this evidence out of fear that it may contribute to the jury's perception of Simmons as an individual incapable of controlling his violent behavior.  See Graham v. Dormire, 212 F.3d 437, 440 (8th Cir. 2000) (noting that reasonable trial strategy does not constitute ineffective assistance of counsel).

Other evidence about Simmons's background was available however, and we do not agree with the Missouri Supreme Court's decision to reject Simmons contention that his attorneys acted ineffectively when they refused to introduce any evidence of his background.  At Simmons's second trial, his attorneys could have introduced evidence that: (1) he was raised in a very strict home environment; (2) his father had a drinking problem and would beat Simmons's mother in front of him; (3) until he was 17 years of age, he was beaten by his mother so severely that he was left

-11-

with welts and bruises; (4) he was so scared of being beaten that he would urinate on himself prior to the beatings; (5) he ran away from home at age 12 or 13 and was assaulted, and possibly raped, in Chicago; (6) he grew up in an impoverished neighborhood frequented by street violence; and (7) his IQ was 83. Instead, Simmons's attorneys introduced only one witness during the penalty phase: Simmons's mother. Instead of discussing Simmons's traumatic childhood, Simmons's mother stated that she loved her son and would draw value from a continued relationship with him.

The Missouri Supreme Court rejected Simmons's contention that it was unreasonable for his attorneys not to introduce this background evidence. In support of its decision, the court noted that Simmons's attorneys could have introduced evidence of Simmons's childhood beatings, his father's alcoholism, his parents violent relationship, and his childhood assault in Chicago. See Simmons II, 955 S.W.2d at 776. However, the Missouri Supreme Court reasoned that Simmons's attorneys' decision not to introduce this evidence during the penalty phase of the McClendon trial constituted "clearly sound trial strategy":

> During the penalty phase of Simmons's first murder trial, defense counsel had, in fact, placed much of this [background] information before the jury. That jury, however, decided that the information did not mitigate the aggravating circumstances and sentenced Simmons to death. Considering that the strategy had once failed, and that calling Simmons' relatives to testify about his upbringing would inevitably highlight the fact that his brother had endured the same upbringing yet had become a successful doctor, we agree [that] . . . the penalty phase course of action was . . . sound trial strategy.

Simmons II, 955 S.W.2d at 776.

We believe that the Missouri Supreme Court's resolution of this issue was based on an "unreasonable determination of the facts in light of the evidence

presented in the State court proceeding." 28 U.S.C. § 2254(d). It eludes us how the Missouri Supreme Court could have concluded that evidence of Simmons's traumatic childhood was introduced during the penalty phase Simmons's first murder trial.[3] Our independent review of the record leads us to conclude that the Missouri Supreme Court's conclusions regarding the evidence that was presented during the penalty phase of that trial are completely inaccurate. During the penalty phase of Simmons's first murder trial, his attorneys presented only two witnesses to testify. Neither of these witnesses testified about the beatings suffered by Simmons as a child, his fear of those beatings, his father's alcoholism, his parents violent relationship, or his victimization in Chicago. In fact, both witnesses testified that Simmons's mother was an upstanding person.

The first witness who testified during the penalty phase of Simmons's first murder trial was Ernest White, a member of Simmons's mother's church. White testified that he occasionally spoke with Simmons when Simmons was a teenager. Transcript on Appeal, Volume IV at 1321, State v. Simmons, 815 S.W.2d 426 (Mo. 1991) (en banc). White also testified that if Simmons was sentenced to life, he would "see that the prison ministry will see to him and keep him in check." Id. at 1323.

Anita Clay also attended church with Simmons's mother. Clay testified that she had not seen Simmons on a consistent basis since he entered his late teens. Id. at 1328. According to Clay, Simmons was a "smart-alecky" teenager who was "weak" and "followed the crowd." Id. at 1330. Finally, Clay testified that she would help to maintain a relationship between Simmons and his family in the event he was given a life sentence. Id. at 1331.

---

[3]As stated earlier, Simmons was originally tried and convicted for the murders of McClendon and Johnson in the same proceeding. After these convictions were reversed, Simmons was tried and convicted for the murder of Johnson. He was then tried and convicted for the murder of McClendon.

We have thoroughly reviewed the testimony presented during the penalty phase of Simmons's first murder trial, and have determined that the Missouri Supreme Court erroneously characterized the mitigating evidence presented to the jury during the penalty phase of that trial. Simmons's attorneys failed to present any meaningful mitigating evidence during the first murder trial. Contrary to the Missouri Supreme Court's suggestion, introducing evidence of Simmons's violent, abusive background was not part of a "strategy [that] had once failed." Simmons II, 955 S.W.2d at 776. It was therefore unreasonable for the court to justify Simmons's attorneys' failure to introduce background evidence by speculating that such a strategy would fail again if used again during the McClendon trial.

Moreover, Simmons's attorneys' actions cannot be considered a product of a reasonable trial strategy because there was no justifiable reason to prevent the jury from learning about Simmons's childhood experiences. See U.S. v. Villalpando, 259 F.3d 934, 939 (8th Cir. 2001) (noting that some strategy decisions are so unreasonable that they can support a claim of ineffective assistance of counsel) (citations omitted). By the time Simmons's mother was called to testify, the jury had yet to hear any evidence that was sympathetic to Simmons. Instead, the jury had only heard evidence of his ruthless character. Further, Simmons's attorneys should have been aware that they could not rely on pleas from Simmons's mother in an effort to spare Simmons's life.[4] During the penalty phase of the McClendon murder trial, Simmons's mother testified that she loved her son and would benefit from a continued relationship with him. This testimony was similar to that proffered by Clay

---

[4]Simmons's attorneys should have been aware that they could not rely on the testimony of Simmons's mother because she testified during the penalty phase of the Johnson trial. Yet, Simmons was sentenced to death after that penalty phase.

during Simmons's first murder trial.[5]  Yet, Clay's testimony proved to be ineffective.

Further, we do not agree with the state's argument that Simmons's attorneys made a reasonable strategic decision to ignore evidence of Simmons's background because they wanted to avoid comparisons to Simmons's successful brother.[6]  There was no evidence to suggest that Simmons's brother was beaten as consistently or severely as Simmons, nor was there evidence to suggest that Simmons's brother was sexually assaulted during his childhood.  Moreover, considering the overwhelming amount of aggravating evidence that had been proffered by the state, we do not believe that comparisons to a successful brother would have made the jury's perception of Simmons any worse.  By the time the state was finished with its case, the jury's perception of Simmons could not have been more unpleasant.  Mitigating evidence was essential to provide some sort of explanation for Simmons's abhorrent behavior.  Despite the availability of such evidence, however, none was presented. Simmons's attorneys' representation was ineffective.

The remaining question then, is whether Simmons was prejudiced by his attorneys' failures.  The Missouri Supreme Court did not reach this question because it concluded that Simmons's attorneys' penalty phase actions were part of a sound

---

[5]Clay's testimony was apparently intended to demonstrate that Simmons would enjoy a continued relationship with his family, particularly with his mother, if he was sentenced to life in prison.  Although the testimony of Simmons's mother provided more emotional appeal, it was also intended to show that Simmons's would continue to be part of a beneficial familial relationship in the event that he was allowed to live.

[6]The Missouri Supreme Court also agreed with the Rule 29.15 court's conclusion that delving too deeply into Simmons's background would do more harm than good, by opening up "dangerous avenues for the State to explore." Simmons II, 955 S.W.2d at 776.  We do not agree with this reasoning.  The jury had already convicted Simmons of murdering McClendon, and we fail to see how disclosures of childhood transgressions would have caused any significant harm.

trial strategy. Our review of the record convinces us "that there is a reasonable probability that, but for counsel's" failure to present evidence of Simmons's background, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Throughout the McClendon trial, the state portrayed Simmons as an individual who responded violently when his advances were not accepted by women. During the penalty phase, Simmons's attorneys could have presented evidence of Simmons's background to demonstrate that his compulsive, violent reactions were the result of an abusive and traumatic childhood. Further, a vivid description of Simmons's poverty stricken childhood, particularly the physical abuse, and the assault in Chicago, may have influenced the jury's assessment of his moral culpability. Cf. Williams v. Taylor, 529 U.S. 362, 397 (2000) (noting that graphic description of defendant's childhood, filled with abuse and privation, along with evidence of defendant's limited mental capabilities, might influence jury's assessment of moral culpability). Our confidence in the outcome of the McClendon trial has been undermined by Simmons's attorneys' failure to include the details of Simmons's background during their penalty phase presentation. See Strickland v. Washington, 466 U.S. 668, 694 (1984) (noting that a probability sufficient to undermine confidence in the outcome is sufficient to establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different). In our view, had this evidence been presented, there is a reasonable probability that at least one of the jurors would have voted against the imposition of the death penalty. This would have allowed the trial judge to resolve the ensuing deadlock by sentencing Simmons to a term of life imprisonment. Thus, Simmons has demonstrated that he was prejudiced by his attorneys' ineffective representation, and he is therefore entitled to a new penalty phase trial.[7]

_____

[7]Simmons also claims that the trial court allowed the prosecution to present evidence regarding the murder of Cheri Johnson during the penalty phase of his

-16-

C.

Next, Simmons argues that the prosecutor made a number of statements during his closing argument in the guilt phase of the McClendon trial that were improper and violated Simmons's constitutional right to due process.[8] The Missouri Supreme Court rejected this argument and held that no prejudice resulted from the Simmons's attorneys' failure to object to these statements, and that his attorneys were not deficient for failing to object. Simmons II, 955 S.W.2d at 774. Simmons has failed to demonstrate that the Missouri Supreme Court misapplied clearly established federal law in making this decision. Moreover, our review of the challenged statements convinces us that these remarks are not "improper as a matter of federal law" and did not "result[] in sufficient prejudice to merit habeas relief." Johnston v. Luebbers, 288 F.3d 1048, 1057 (8th Cir. 2002).[9]

---

murder trial for the murder of McClendon in violation of his Fifth, Sixth, Eighth and Fourteenth amendment rights. Because we have already granted Simmons a new penalty phase trial, an analysis of this issue is unnecessary.

[8]Simmons also complains about the several arguments made by the prosecutor during the penalty phase of the McClendon trial. Once again, we need not address this argument, as we have already granted Simmons a new penalty phase trial.

[9]Simmons's petition contains two additional claims. First, he contends that he received the ineffective assistance of counsel during the guilt phase of his trial when his attorneys failed to object to the testimony of Detective Blanks. We have reviewed the testimony of Detective Blanks and have determined that Simmons was not prejudiced when his attorneys failed to object to that testimony. Simmons's guilt was established by a variety of additional evidentiary submissions, so the exclusion of Blank's testimony would not have influenced the jury's decision to convict Simmons for McClendon's murder.

Simmons also contends that the federal district court improperly rejected his claim that he is currently incompetent to be executed. Once again, the claim has been rendered moot by our decision to order a retrial of Simmons's penalty phase. Further,

D.

Next, Simmons argues that his trial attorneys were ineffective for failing to introduce available mitigating evidence during the penalty phase of the Johnson trial. This is essentially the same claim that was presented by Simmons in connection with the habeas proceedings that relate to his conviction for the murder of McClendon. During the penalty phase of the Johnson trial, Simmons's attorneys did nothing more than present his mother to testify that she loved Simmons and would continue to cultivate her relationship with him if he was sentenced to life in prison. In doing so, Simmons's attorneys ignored the same background evidence that was available during the McClendon trial.

The Missouri Supreme Court's analysis of this claim is virtually identical to its analysis of the same claim presented in connection with the McClendon proceedings. The Missouri Supreme Court concluded that because Simmons's attorneys presented background information during the first murder trial, and because this strategy proved to be unsuccessful, it was reasonable for his attorneys to forgo this strategy during the Johnson trial. Simmons I, 955 S.W.2d at 750-51. The Missouri Supreme Court also noted that presenting evidence of Simmons's upbringing would "highlight the fact that his brother had endured the same upbringing and yet had become a successful doctor . . . ." Id.

Because this claim, and its factual underpinnings, are virtually identical to the claim presented in the McClendon proceedings, we apply that analysis here, and find that the Missouri Supreme Court's resolution of this claim was based on an

---

although Simmons contends that he was incompetent during the McClendon trial, this issue was not presented to the district court, and no certificate of appealability was granted on this issue. Accordingly, we need not address this argument. See Fields v. United States, 201 F.3d 1025, 1026 n. 2 (8th Cir. 2000) (holding that issues beyond scope of certificate of appealability are not properly before court).

"unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The court erroneously believed that evidence of Simmons's background had not affected the outcome of the penalty phase of Simmons's first murder trial. Therefore, it was not reasonable for the court to conclude that Simmons's attorneys made an informed decision to ignore this evidence to avoid a "strategy [that] had once failed." Simmons I, 955 S.W. 2d at 750. Once again, we find that Simmons' attorneys' were deficient for failing to introduce this evidence, and that, had this evidence been presented, there is a substantial possibility that at least one juror would have voted in favor of life imprisonment. As such, we hold that Simmons is entitled to new penalty phase trial in connection with the Johnson proceedings.[10]

E.

Next, Simmons complains that he received ineffective assistance of counsel during the Johnson trial when his attorneys failed to object to testimony regarding his failure to appear for a police interview. During the Johnson trial, Sergeant Sal Chrum testified about his efforts to locate Simmons for a police interview. Chrum stated that

---

[10]Simmons also claims that the federal district court erred when it denied his claim that he is currently incompetent to be executed without holding an evidentiary hearing. This claim has been rendered moot by our decision to grant Simmons a new penalty phase trial.

In addition, Simmons argues that the prosecutor made a number of statements during the Johnson trial which were improper and violated his right to due process. Simmons also argues that his received the ineffective assistance of counsel when his attorneys failed to object to several of these statements. We have reviewed the trial record, and conclude that the challenged remarks did not "so [infect] the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986). Simmons is not entitled to habeas relief on this claim.

-19-

Simmons knew the police were looking for him, and agreed to come to the station for an interview after the police contacted him. Chrum then testified that Simmons never appeared for the scheduled interview. Simmons contends that his attorneys should have objected to this testimony because his decision not to appear should not have been used to incriminate him. He argues that his silence is protected by the Fifth Amendment.

Simmons presented this claim differently to the Missouri Supreme Court. There, he argued that Chrum's testimony violated his Fifth Amendment right to silence and did not mention his attorneys' failure to object. The court rejected his claim, reasoning that Detective Chrum's testimony did not implicate Simmons's right to remain silent. Simmons I, 955 S.W.2d at 737. The Court also stated that evidence of a defendant's silence is inadmissible only if the defendant was in custody at the time of his silence. Id. (citation omitted).

We need not address the merits of Simmons's argument. Even if his attorneys failed to object to Chrum's testimony, and that failure rose to the level of ineffective assistance, the evidence presented at trial was sufficient to establish his responsibility for the murder of Johnson, without Chrum's testimony. Therefore, Simmons was not prejudiced by his attorneys' alleged failures, and he is not entitled to habeas relief on this claim.

F.

Finally, Simmons asserts that during jury selection for the Johnson trial, the prosecutor removed Romana Brown, an African-American venireperson, from the jury because of her race, in violation of Batson v. Kentucky, 476 U.S. 79 (1986). In order to bring a Batson challenge, the "party challenging a peremptory challenge must first make a prima facie showing of racial discrimination." United States v. Campbell, 270 F.3d 702, 705 (8th Cir. 2001) (citing Purkett v. Elem, 514 U.S. 765,

-20-

767 (1995)). "'This can be done by showing circumstances that give rise to a reasonable inference of racial discrimination.'" Id. (quoting United States v. Hill, 249 F.3d 707, 714 (8th Cir. 2001)). Once this showing is made, the burden shifts to the State to provide a "neutral explanation for challenging black jurors." Batson, 476 U.S. at 97. The defendant then has the "opportunity to argue that the prosecutor's facially neutral explanations were merely a pretext for discrimination." Jones v. Jones, 938 F.2d 838, 844 (8th Cir. 1991).

Simmons complains that the prosecutor's stated reasons for striking Brown were not case-specific, race-neutral explanations, but rather were pretextual and racially motivated. The prosecutor stated that he struck Brown because she was indecisive, seemed to have a bad attitude about jury service, seemed to dislike him, and because she did not appear to support the death penalty. In addition, the prosecutor noted that Brown worked for a downtown post office and explained that he had poor results from other jurors who worked there. Simmons claims that the prosecutor's excuse that Brown worked for the post-office is pretext for racial discrimination.

The Missouri Supreme Court applied the Batson standard and rejected Simmons's argument. It concluded that "the reasons set forth by the prosecutor are sufficiently race-neutral . . . to allow us to conclude that the trial court did not clearly err in denying [Simmons's] Batson challenge." Simmons I, 955 S.W.2d at 737. Whether the prosecutor's stated reasons for striking Brown were pretextual is a question of fact. "In habeas proceedings in federal courts, the factual findings of state courts are presumed to be correct, and may be set aside, absent procedural error, only if they are 'not fairly supported by the record.'" Purkett, 514 U.S. at 769 (citing 28 U.S.C. § 2254(d)(8)); see also Weaver v. Bowersox, 241 F.3d 1024, 1031 (8th Cir. 2001) (noting that factual findings made by state appellate courts are entitled to the same presumption of correctness as findings of state trial courts) (citation omitted). Moreover, this court has stated that "[o]ur deference to trial court fact-finding is

doubly great" when considering <u>Batson</u> challenges because of the "'unique awareness of the totality of the circumstances surrounding voir dire.'" <u>Weaver</u>, 241 F.3d at 1030 (quoting <u>United States v. Moore</u>, 895 F.2d 484, 486 (8th Cir.1990)).

Simmons's showing falls short of rebutting the court's presumptive correctness when it concluded that the prosecutor did not violate <u>Batson</u>. Several of the prosecutor's reasons for striking Brown were predicated upon his observation of Brown's behavior during the course of the voir dire proceeding. Simmons has simply pointed to the record in an attempt to demonstrate that these observations were pretextual. Under these circumstances, however, the record itself is insufficient to allow us adequately assess the prosecutor's stated motivations for his peremptory challenge, as behavior considerations such as "hesitation, lack of eye contact, flippancy and other intangibles [are] observed only by those present in the courtroom." <u>Weaver</u>, 241 F.3d at 1032 (citation omitted). As such, without more, we are unable to conclude that the Missouri Supreme Court's factual findings were incorrect. Simmons is not entitled to habeas relief on this claim.

III. Conclusion.

For the reasons set forth in the text of this opinion, the district court's denial of Simmons's petition for habeas corpus relief is affirmed in part and reversed in part. We remand to the district court and direct it to grant Simmons new penalty phase trials for his convictions for the murders of McClendon and Johnson.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-22-